IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NEWPORT NEWS DIVISION

UNITED STATES OF AMERICA

v.                                     Case No. 4:24cr4

DAVID LEE MERRYMAN


### DEFENDANT DAVID L. MERRYMAN'S POSITION WITH RESPECT TO SENTENCING FACTORS

COMES NOW the defendant, David L. Merryman, and as and for his Sentencing Pleading, respectfully states the following:

### INTRODUCTION

As discussed in detail below, the defendant respectfully submits that a sentence of 72 months (6 years), combined with a substantial fine, is sufficient but not greater than necessary as contemplated under 18 U.S.C. § 3553(a).

On the other hand, again, for the detailed reasons stated below, the defendant respectfully submits that the Government's recommendation of 168 months (14 years), the agreed cap on the Government's recommendation under the Plea Agreement (Paragraph 5.a. thereof) is excessive, and greater than necessary under 3553(a).

### OBJECTIONS

The defendant respectfully notes the following objections to the Advisory Guidelines enhancements in the Presentence Investigation Report:

### Count 3: Wire Fraud Offense

1.      Paragraph 44., p.21 - proposing a 4-level enhancement under U.S.S.G. § 2B1.1(b)(2)(B) for "substantial financial hardship to five or more victims," - OBJECT, on the grounds that: (a) there were not five or more victims of the wire fraud, as "victim" is defined

1

under the U.S.S.G.; and, (b) even if, *arguendo*, there were, there is insufficient evidence by a preponderance of the evidence of "substantial financial hardship" to them as a result of the wire fraud offense;

    2.    Paragraph 45., p. 21 - proposing a 2-level enhancement under U.S.S.G. § 2B1.1(b)(10)(C) for "sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means" - OBJECT, on the grounds that: (a) the offense does not involve "sophisticated means;" (b) nor did the defendant engage in/cause any conduct "constituting sophisticated means;"

    3.    Paragraph 47., p. 22 - proposing a 2-level enhancement under U.S.S.G. § 2B1.1(b)(16)(B) for "possession of a dangerous weapon (including a firearm)" - OBJECT, on the grounds that the law and the evidence do not support that the wire fraud offense involved such a possession.

<u>Argument in Support of Guidelines Objections 1.-3. Above</u>

    Mr. Merryman objects to the above three enhancements to the Advisory Guidelines range applicable to his conviction on Count 3 of the Superseding Indictment against him.  As a prefatory matter, Mr. Merryman is incredibly remorseful for his actions and recognizes that he has caused significant intangible harm to the individuals who rented homes from him. He does, however, object to the application of certain enhancements to his wire fraud conviction as untethered to the factual basis supporting that conviction.

No Substantial Financial Hardship.

    Section 2B1.1(b)(2)(B) provides for a four-level enhancement to a defendant's advisory guidelines range if his offense of conviction "resulted in *substantial financial hardship* to *five or more* victims."  In determining whether the offense resulted in a substantial financial hardship, the guidelines instruct that the court shall consider, among

other factors, whether victims became insolvent, filed for bankruptcy, or suffered substantial changes to their financial picture – including their investment funds, employment or retirement plans, living arrangements, or ability to obtain credit.  *See* U.S.S.G. § 2B1.1 cmt. n. 4(F).  A "victim" for purposes of this enhancement includes a person who sustained any part of the actual loss attributable to the defendant's offense <u>or</u> any individual whose means of identification was used unlawfully or without authority.  *Id.* at cmt. n. 4(E).  Because the government is unable to establish – by a preponderance of the evidence – that *any* victim suffered substantial financial hardship, this enhancement should not be applied.

Of the individual renters named in the Statement of Facts supporting Mr. Merryman's plea, none of them became insolvent, filed for bankruptcy, or had any impact to their financial situation tied to Mr. Merryman's wire fraud conviction.  With respect to Count Three, the defendant has been convicted of executing a scheme and artifice to obtain rent relief benefits to which he was not entitled.  As Mr. Merryman has admitted in connection with his plea, this scheme did involve the use of certain of his renters' means of identification, such that certain of them (though not five) may appropriately be considered "victims" under § 2B1.1.  None of the renters, however, suffered a substantial financial hardship as a result of the rent relief benefits scheme.

There is no evidence that any renter became insolvent, filed for bankruptcy, or suffered any loss – let alone a substantial loss – a retirement, educational, or saving or investment account.  Similarly, as a result of Mr. Merryman's rent relief fraud, none of his renters postponed their retirement plans, relocated homes, or had difficulty obtaining credit.  *See* § 2B1.1 cmt. n. 4(F).  Mr. Merryman recognizes that one renter, E.P., has continued to experience difficulties obtaining housing as a result of legal actions filed against her for unpaid rent.  *See* Statement of Facts ¶ 48.  Those difficulties – and Mr. Merryman's lawsuits

– are not tied to the rent relief scheme charged in Count Three, such that they cannot be used to establish a substantial financial hardship for purposes of this enhancement.  And, moreover, no other renters are alleged to have experienced a meaningful change to their financial position as a result of the rent relief scheme.

For these reasons, and again in recognition that renters experienced other intangible impacts as a result of his wire fraud offense, Mr. Merryman objects to the application of this enhancement.

Sophisticated Means

Under U.S.S.G. § 2B1.1(b)(10)(C), an offense level shall be increased by two levels when the offense "involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means."  Comment 9(B) to U.S.S.G. § 2B1.1(b)(10)(C) defines sophisticated means as "especially complex or especially intricate offense conduct pertaining to the execution or concealment of the offense."  Comment 9(B) lists as examples: hiding assets or transactions through the use of fictitious entities, corporate shells, and offshore financial accounts.

The sentencing guidelines enhancement for sophisticated means "is warranted only when the conduct shows a greater level of planning or concealment than a typical fraud of its kind." *US v. Ghaddar*, 678 F.3d 600, 602 (7th Cir. 2012).  Not all of the component actions must be sophisticated for this enhancement to apply; it is sufficient that the scheme taken as a whole is a sophisticated one.  *See United States v. Adepoju*, 756 F.3d 250, 257 (4th Cir. 2014); *accord Ghaddar*, 678 F.3d at 602 ([N]ot all of Ghaddar's actions needed to be elaborate for the adjustment to apply; it is enough that, as the district court found, his actions when viewed as a whole constituted a sophisticated scheme.)  The dispositive factor is whether the fraud exhibited more planning or concealment than a typical fraud of its kind.

4

*Id.*

Cases applying the sophisticated means enhancement most often involve concealment of assets, use of fraudulent accounts, or fictitious documents. *See United States. v. Aderinoye*, 33 F.4th 751 (5th Cir. 2022) (applying the enhancement to a defendant who created fraudulent accounts and business entities); *United States v. Robinson*, 538 F.3d 605, 607 (7th Cir. 2008) (applying the sophisticated means enhancement in a bank fraud case in which the defendant created fake entities, doctored computer communications, and fabricated customer contact information); *United States v. Fife*, 471 F.3d 750, 754 (holding that the trial court properly applied the enhancement when the defendants' fraud involved shell companies, failures to disclose, and submitting incomplete records).

The enhancement for sophisticated means requires "more than just thoughtful or potentially successful planning." *Adepoju*, 756 F.3d at 259. Wire fraud requires plans to wrongfully acquire funds and "[the] presence of forgeries or stolen identification, and a plan to use such material to wrongfully acquire moneys, does not necessarily amount to sophistication." *Id.* (discussing bank fraud). The same is true here. Mr. Merryman's actions – though illegal and wholly unacceptable – were not complicated. Through several contractors, he used his renters' personally identifying information to apply for rent relief benefits and faked documents in support of those applications. His scheme was remarkably simple: again, through contractors, he forged rent relief applications. He did not conceal assets, set up shell accounts, engage in any complex financial transactions, or engage in any conduct with *any* badges of sophistication.

Mr. Merryman was a prolific applicant to the rent relief program using his tenants' information. He was *not* a sophisticated fraudster by any stretch. As such, this

enhancement should not apply.

Possession of a Dangerous Weapon

Mr. Merryman has been assessed a two-level enhancement under U.S.S.G. § 2B1.1(b)(16)(B), which applies when a defendant possessed a "dangerous weapon (including a firearm) *in connection with*" the offense.  As with the other guidelines provisions, the Government bears the burden to prove, by a preponderance of the evidence, that this two-level increase applies.

The term "dangerous weapon" has a common sense meaning and is defined in Application Note 1(E) to Section 1B1.1 as follows:

> "Dangerous weapon" means (i) an instrument capable of inflicting death or serious bodily injury; or (ii) an object that is not an instrument capable of inflicting death or serious bodily injury but (I) closely resembles such an instrument; or (II) the defendant used the object in a manner that created the impression that the object was such an instrument (e.g. a defendant wrapped a hand in a towel during a bank robbery to create the appearance of a gun).

First, there is no evidence that the defendant ever <u>possessed</u> a firearm. At all relevant times in this case, the defendant was a prior convicted felon prohibited from possessing a firearm and he did not. Were there such evidence of possession, surely the Government would have charged that offense as well.

Moreover, even if, *arguendo*, there were such a possession of any dangerous weapon (which there was not), the second prong of § 2B1.1(b)(16)(B) requires possession *in connection with* the fraud offense.  While "in connection with" is not limited to the specific time the defendant committed the fraud offense, such possession must be part of the relevant conduct pertaining to the fraud offense.  *United States v. Valenzuela*, 816 Fed. Appx. 211, 212 (9th Cir. 2020).  Such acts may include possession of "in preparation of the

offense," or in the course of "attempting to avoid detection or responsibility" for that offense, or in efforts "to evade arrest." *Id.* (citing U.S.S.G. § 1B1.3(a)(1)(A)). It is insufficient that a defendant possess a weapon and also commit a fraud offense: the two must be tied intentionally related to one another, and not merely incidental.

Accordingly, even were there such a possession, there could be no such possession *in connection with* a scheme to obtain rent relief payments. That scheme involved phony applications for money using renters' personally identifiable information and fraudulent documentation in support of the same. In supporting this enhancement, the government attempts to shoehorn *all* of Mr. Merryman's actions between 2019 and 2024 into his wire fraud scheme – and in so doing paints with too broad a brush. Because there is also insufficient evidence to establish that Mr. Merryman possessed a dangerous weapon in connection with his rent relief fraud scheme, this enhancement should be removed.

4.      Paragraph 48., p. 22 - proposing a 3-level enhancement under U.S.S.G. § 3A1.1(a) for "intentionally selected any victim as the object of the offense of conviction because of" certain victim characteristics - OBJECT, on the grounds that: (a) there were no such "selectable" victims under the WIRE FRAUD offense, as "victim" is defined under the U.S.S.G.; and, (b) even if there were, the specific WIRE FRAUD offense did NOT involve such an "intentional selection" (as opposed to the COUNT 11: Raced-Based Interference with Housing and COUNT 31: Race-Based Interference with Employment offenses, which did involve such selection by their very terms/elements).[1]

---

[1] Defense counsel is well aware of Paragraph 7. 13., p. 7 of the PSR, already fully accepted by the defendant through his guilty plea, and through his confirmation of this stipulated Statement of Facts both under oath and to the Probation Officer, which states, in pertinent part, that one of the:

> objects of the scheme and artifice included...c) to offer for rent homes
> that were in poor repair or failed to meet even basic standards of
> habitability by targeting vulnerable African American tenants, ...

<u>Argument in Support of Guidelines Objection 4. Above</u>

U.S.S.G § 3A11(a) states, in pertinent part, that:

> If … the court at sentencing determines beyond a reasonable doubt that the defendant initially selected any victim… as the object of the offense of conviction because of the actual or perceived race… of any person, increase by 3 levels.

Moreover, the Commentary, Application Note 1. states, also in pertinent part, that, "Subsection (a) applies to offenses that are hate crimes."

The defendant respectfully submits that that this proposed enhancement does not apply.

First, there is a reasonable doubt as to whether the defendant intentionally selected African American citizens as the object of the offense of conviction.

The offense of conviction is wire fraud. The gist of this offense was a scheme to defraud certain governmental entities in connection with pandemic relief programs offered to landlords. There is no evidence that the defendant selected these governmental entities on the basis of race.

The defendant recognizes that subsumed within the wire fraud Counts are several natural persons/individuals as victims.  However, the predominant and overwhelming thrust of the wire fraud Counts involves governmental pandemic fraud victims, and not individuals.

Moreover, there is a reasonable doubt as to whether the several individuals under

_____

frequently using discriminatory justifications for his refusals.

The defendant does not in any way withdraw from his acceptance of these stipulated facts. However, defense counsel respectfully believes and submits that there is <u>a legitimate legal argument</u> that this stipulated conduct does not rise legally to the level of the "intentional selection" definition as contemplated by the Guidelines, to properly enhance the Wire Fraud offense, which counsel does not believe is correct, as opposed to the Count 11 and Count 31 inherent race-based offense features which are present instead in those offenses.

the wire fraud Counts were selected based on race. The evidence indicates that the individual victims were tenants whom the defendant allegedly mistreated or abused in connection with rent payments, not because of their race, which was incidental, but because of their position as tenants (regardless of race) who simply owed debts to the defendant.

While in no way excusing the conduct, defense counsel nevertheless respectfully submits that the technical application of this enhancement to the wire fraud offense is misplaced. Based on this legal argument, the defendant respectfully submits that the enhancement should not be applied.

Lastly, the wire fraud offenses are certainly not "hate crimes," as embraced by that phrase. Given that Application Note 1. states that this enhancement "applies to offenses that are hate crimes," as a matter of law, on its face, this enhancement is inapplicable.

5.      Paragraph 49., p. 22 - proposing a 2-level enhancement under U.S.S.G. § 3A1.1 (b)(1) because "[t]he defendant knew or should have known the victim of the offense was a vulnerable victim" - OBJECT, on the grounds that the law and the evidence do not support that the "victim of the offense was a vulnerable victim" particularly as defined, and intended, by U.S.S.G. § 3A1.1(b)(1)."[2]

---

[2]  Defense counsel respectfully reiterates that, again, he is well aware of Paragraph 7. 13., p. 7 of the PSR, already fully accepted by the defendant through his guilty plea, and through his confirmation of this stipulated Statement of Facts both under oath and to the Probation Officer, which states, in pertinent part, that one of the:

> objects of the scheme and artifice included...c) to offer for rent homes that were in poor repair or failed to meet even basic standards of habitability by targeting vulnerable African American tenants, ... frequently using discriminatory justifications for his refusals.

The defendant does not in way, again, withdraw from his acceptance. However, defense counsel respectfully believes and submits that there is also a legitimate legal argument that this stipulated conduct does not rise legally to the level of the "vulnerable victim" definition as contemplated by the Guidelines to properly enhance the Wire Fraud offense.

<u>Argument in Support of Guidelines Objection 5. Above</u>

In U*nited States v. Llamas, 599 F.3d 381, 388 (4th Cir.), cert. denied, 560 U.S. 958 (2010)*, the Court noted that:

> Section 3A1.1(b)(1)... creates a two-prong test for assessing the application of the vulnerable victim adjustment. First, a sentencing court must determine that a victim was unusually vulnerable. Second, the court must then assess whether the defendant knew or should have known of such unusual vulnerability.

The defendant respectfully submits that the victims of the wire fraud Counts were not unusually vulnerable.

First, as pointed out under Objection 4., *supra*, the primary victims were governmental entities who certainly cannot be said to be unusually vulnerable.

Second, the much smaller subset of individual victims likewise were not unusually vulnerable as that phrase is contemplated under the Guidelines. Again, while in no way condoning the conduct, that the defendant was a landlord and the individual victims were tenants does not in and of itself create an unusually vulnerable victim relationship, anymore than any other creditor-debtor relationship.

U.S.S.G. § 3A1.1(b)(1), Commentary, Application Note 2., for example, distinguishes between the unusually vulnerable cancer victim patient targeted by a defendant who fraudulently "marketed an ineffective cancer cure or in a robbery in which the defendant selected a handicapped victim," from a fraudulent securities mail scheme 'to the general public and one of the victims happened to be senile." Likewise, "a bank teller is not an unusually vulnerable victim solely by virtue of the teller's position in a bank."

Similarly, the landlord-tenant relationship in and of itself does not comprise one of the special vulnerabilities contemplated by Application Note 2., but, rather, is a more

general creditor-debtor relationship not automatically triggering this special enhancement.

Accordingly, as the individual victims were not "unusually vulnerable," then, *a fortiori*, the defendant could not know or should know "of such unusual vulnerability," since none exists to begin with.

For the foregoing reasons, therefore, the defendant respectfully submits that Objection 5. should be sustained and the vulnerable victim enhancement should not apply.

<u>Count 11: Race-Based Interference With Housing</u>
and
<u>Count 31 Race-Based Interference With Employment</u>

6.      Paragraph 54., p. 22 (Count 11) AND Paragraph 69., p. 23 (Count 31) – proposing  a 6-level enhancement under U.S.S.G. § 2A6.1(b)(1), under each Count of conviction, because "[t]he offense involved any conduct evidencing an intent to carry out such threat," – OBJECT, on the grounds that the evidence is insufficient to support a finding by a preponderance of the evidence of "conduct evidencing an intent to carry out such threat."

<u>Argument in Support of Guidelines Objection 6. Above</u>

In *United States v. Spencer, 628 Fed. Appx. 867, 869-870 (4th Cir. 2015)*, the Court found that the District Court erred in applying this enhancement because:

> Spencer's inclusion of a substance he knew to be dried toothpaste does not constitute conduct evidencing an intent to carry out a threat to kill or injure the recipient of his letter because it does not show a subjective belief on Spencer's part that he would carry out the threat, or increase the likelihood that he would carry it out.

The essence of *Spencer, supra*, is that mere threats alone are insufficient to support this 6-level enhancement; rather, there needs to be some clear overt act evidencing a true intent to carry out the threat.

It is well established that the Government bears the burden of establishing an enhancement by a preponderance of the evidence. The defendant respectfully submits that the evidence to be relied upon by the Government is insufficient to meet that burden, and that the evidence insufficiently supports the kind of "conduct evidencing an intent to carry out a threat..."

For these reasons, the defendant respectfully submits that this enhancement should not apply.

7.     Paragraph 56., p. 22 (Count 11), AND Paragraph 71., p. 23 (Count 31)– proposing a 2-level enhancement under U.S.S.G. § 2A6.1(b)(3), under each Count of conviction, because "[t]the offense involved the violation of a court protection order," – OBJECT, on the ground that the evidence is insufficient to support a finding by a preponderance of the evidence that this "offense involved the violation of a court protection order."

<u>Argument in Support of Guidelines Objection 7. Above</u>

The defendant's objection to this proposed enhancement is purely fact-based.

Again, as stated above, it is axiomatic that the Government bears the burden of establishing each enhancement bv a preponderance of the evidence.  The defendant respectfully submits that at no time did he ever violate a Protective Order. Although the Government contends that he did, the defendant respectfully denies this allegation and asserts that the proof will fail to establish by a preponderance that he did.

For these reasons, the defendant respectfully submits that this enhancement also should not apply.

8.     Paragraph 57., p. 22 (Count 11), AND Paragraph 72., p. 23 (Count 31) – proposing a 3-level enhancement under U.S.S.G. § 3A1.1(a) for "intentionally selected any

victim as the object of the offense of conviction because of" certain victim characteristics -

OBJECT, on the grounds that this particular offense characteristic is already contained

within, and a part and parcel of, the Base Offense Level conduct, and, accordingly, granting

an additional enhancement for a characteristic already included within the Base Offense

Level constitutes impermissible "double counting" and/or a duplicative enhancement.

9.      Paragraph 58., p. 22 (Count 11) – proposing a 2-level enhancement under

U.S.S.G. § 3A1.1(b)(1) because "defendant knew or should have known the victim of the

offense was a vulnerable victim" – OBJECT, on the grounds that the evidence does not

support that the "victim of the offense was a vulnerable victim" particularly as defined, and

intended, by U.S.S.G. § 3A1.1(b)(1)."[3]

<u>Argument in Support of Guidelines Objection 9. Above</u>

As noted under Objection 5., *supra*, in U*nited States v. Llamas, 599 F.3d 381, 388

(4th Cir.), cert. denied, 560 U.S. 958 (2010)*, the Court noted that:

> Section 3A1.1(b)(1)... creates a two-prong test for assessing the
> application of the vulnerable victim adjustment. First, a
> sentencing court must determine that a victim was unusually
> vulnerable. Second, the court must then assess whether the
> defendant knew or should have known of such unusual
> vulnerability.

---

[3] Once again, as noted in footnote 2, *supra*, defense counsel is well aware of Paragraph 7. 13., page
7 of the PSR, already fully accepted by the defendant through his guilty plea, and through his
confirmation of this stipulated Statement of Facts, both under oath and to the Probation Officer,
which states, in pertinent part, that one of the:

> objects of the scheme and artifice included...c) to offer for rent homes
> that were in poor repair or failed to meet even basic standards of
> habitability by targeting vulnerable African American tenants, ...
> frequently using discriminatory justifications for his refusals.

The defendant does not in way, again, withdraw from his acceptance. However, defense counsel
respectfully believes and submits that there is, as noted in footnote 2, *supra*, <u>a legitimate legal
argument</u> that this stipulated conduct does not rise legally to the level of the "vulnerable victim"
definition as contemplated by the Guidelines to properly enhance the Wire Fraud offense.

The defendant respectfully submits that the victims of Count 11 were not unusually vulnerable, as contemplated within that term.

It appears that the Government's position is that the Count 11 victims are "unusually vulnerable" based on race.

The undersigned defense counsel has repeatedly made it clear throughout earlier filings in this case as well in the instant Position Paper that in no way does the defense condone, approve, or otherwise legitimize the very serious and disturbing race-based behavior or comments contained within this case. However, the defendant respectfully submits that, as a matter of law, being the member of a minority race (or, for example, as with the undersigned counsel, being a member of a minority religion) does not mean that that entire population is automatically "unusually vulnerable." Rather, the vulnerability at issue must arise out of some specific circumstance, relationship, or other specific characteristic that is fact-based under the circumstances of the case and not merely as a stereotypical assumption.

Thus, while Count 11 comprises a race-based interference, that does not also equate with a victim being "unusually vulnerable" solely on the basis of race.

Accordingly, the defendant respectfully submits that as a matter of law, this particular enhancement does not apply to Count 11.

## SECTION 3553 (a) FACTORS

18 U.S.C. Section 3553 (a) directs that, "The court shall impose a sentence sufficient but not greater than necessary, to comply with the purposes set forth in paragraph (2)" of that subsection.

## DEFENDANT'S POSITION ON THE APPROPRIATE SENTENCE

As noted in the INTRODUCTION, *supra*, the defendant respectfully submits that under

14

all of the facts and circumstances of this case, a sentence of 72 months (6 years), combined with a substantial fine (range is $30,000 to $300,000), is sufficient but not greater than necessary.

Imposition of this sentence would constitute a downward departure/variance from the Advisory Guidelines range, but, as argued below, it is a justifiable departure/variance. It should be noted that Paragraph 5.b. of the Plea Agreement specifically states "that the defendant reserves his right to request a variance or downward departure on whatever grounds that the defendant deems appropriate."

## NATURE AND CIRCUMSTANCES OF THE OFFENSE

The defendant has pleaded guilty to Counts 3 (Wire Fraud - felony), 11 (Race-Based Interference with Housing - misdemeanor), 28 (Aggravated Identity Theft - felony), and 31 (Race-Based Interference with Employment – misdemeanor) of the Superseding Indictment.

The defendant has fully accepted responsibility, as indicated by his admission that the information in the Statement of Facts is "true and accurate" and by his remorse for his actions and vow to "never do anything like this again." He further conceded being "embarrassed" about what he did and "knows he has let many people down." (PSR at Paragraph 40).

In addition, there is "no information indicating the defendant impeded or obstructed justice." (PSR at Paragraph 39).

<u>Three Substantial Grounds for a Downward Departure/Downward Variance Arising Out of the Nature and Circumstances of the Offense</u>

A.

First, the defendant respectfully submits that the proposed Advisory Sentencing Guidelines as they presently stand in the PSR, are grossly excessive and not appropriate for

this specific case, notwithstanding the seriousness of the offense conduct.

In this particular case, it is very important to pay <u>detailed</u> attention to the <u>precise</u> offenses of conviction.

The defendant stands convicted of aggravated identify theft, which carries a specific sentence of two years confinement, consecutive to any other sentence.

In addition, the offenses of conviction includes two criminal civil rights-based misdemeanors, which each carry a maximum of one year confinement.

The last offense of conviction is wire fraud, which carries up to 20 years imprisonment. The wire fraud conviction principally involves pandemic relief fraud in a loss bracket amount greater than $150,000 (actual amount $233,326.00). This pandemic relief fraud activity in this case is not dissimilar to many other such pandemic fraud cases being prosecuted around the country at this time. Moreover, while not making light of this in any way, out of 16 progressively increasing loss amount brackets under U.S.S.G.§ 2B1.1, "(F) More than $150,000" <u>is the 6th lowest fraud amount bracket of the 16</u>.  From this standpoint, the defendant respectfully submits that the major Count of conviction in this case, to-wit, the wire fraud Count,  is in no way particularly aggravated nor so unusual as to justify a widely disparate treatment of a sentence well above what similar cases have yielded around the country in this loss amount bracket.

Moreover, the defendant respectfully submits that as inappropriate and as disturbing as the race-based behavior and statements were, the two Counts of conviction dealing directly with this offense conduct are <u>misdemeanors</u> carrying an aggregate maximum of 2 years imprisonment. If Congress, it in its wisdom, had determined that such conduct merited more than misdemeanor treatment and a year of confinement, then it had every right to say so, but, in its judgement, it did not.

Accordingly, when distilled to its essence, the defendant receives a 2-year mandatory sentence for the aggravated identify theft and potentially a 2-year aggregate sentence for misdemeanor race-based misconduct, for a total of 4 years.  The Government, on the other hand, asks for the Plea Agreement cap of 168 months (14 years). The defendant respectfully submits, however, that the remaining and major Count of conviction, the wire fraud, at the 6th lowest loss bracket level, should not yield an additional 10 years (120 months) or anything close to that for the pandemic relief fraud component of this case.

Otherwise stated, the defendant respectfully submits that 2 years for identity theft, 2 year for misdemeanor race-based offense conduct, and 2 years for pandemic relief fraud, for a total aggregate sentence of 6 years (72 months) is sufficient but not greater than necessary. 10 years for the pandemic relief fraud, as recommended by the Government (for a total aggregate recommended sentence of 14 years), is simply excessive.

For these reasons, upon this careful analysis, the defendant respectfully submits that in this particular case, the Guidelines are shockingly excessive and are inappropriate for the mix of Counts of conviction in this matter.

## B.

Second, the defendant respectfully submits that, as an initial proposition, he has accepted responsibility under the traditional measures thereof, *i.e*., pleading guilty, acknowledging the Statement of Facts under oath and to the Probation Officer, and remorsefully apologizing for his conduct, thereby earning him the standard 3-level reduction.

However, in this particular case, the defendant has truly engaged in what counsel describes as a rare "acceptance of responsibility-plus." Although not required to do so, the defendant has paid in advance, over a month prior to sentencing, the full amount of restitution in the amount of $233,336.00, thereby making the victims completely whole

17

from the financial losses caused by the defendant. *See* attached as <u>Exhibit 1</u> copy of defense counsel's letter dated November 13, 2024 remitting restitution (and special assessments of $400) to the Clerk of this Court.

In addition<u>, the defendant also paid, at the same time, and well in advance of sentencing</u>, the total amount of forfeiture in the sum of $204,326.00, thereby disgorging himself of all ill-gotten financial gains/unjust enrichment from the wire fraud offense. *See* <u>Exhibit 2</u> – letter remitting forfeiture funds to the United States Attorney, Financial Litigation Unit.

Moreover, the defendant accomplished these unusual pre-sentencing remittances by working long and hard from a jail cell over many months to perfect the sales of a number of properties that he owned to generate the liquid assets needed to make these payments.

The undersigned defense counsel has had the privilege of appearing in this Court on behalf of defendants now for more than 44 years. Counsel does not recall another case in which he was involved in which the defendant paid <u>any</u> advance restitution or forfeiture, much less over $437,000 worth.

Thus, not only has defendant spoken the rhetoric of acceptance of responsibility as well as taken the tangible action of pleading guilty and forgoing a trial, but he has made a remarkable personal financial sacrifice which has real consequences for him through these advance remittances.

For this second reason, therefore, the defendant respectfully submits that a substantial downward variance is appropriate to recognize this exceptional acceptance of responsibility.

C.

Third, the defendant respectfully submits that his offense conduct is rife with, and

permeated by, significant extenuating and mitigating mental health evidence, including: (1) the reported earlier diagnoses (discussed in more detail below and found in the PSR at Paragraphs 146 -150), including earlier diagnoses of depression, and impulse control disorders; and, (2) the anticipated testimony of Clinical Forensic Psychologist Elizabeth Wheeler, who diagnoses the defendant, consistent with these earlier findings, of presently suffering from a personality disorder – severe narcissism, which significantly contributed to this offense conduct.  The defendant respectfully submits that the Court is obligated to temper its sentence with a recognition that the defendant is not well emotionally nor mentally, and that his behavior has no doubt been affected and shaped in significant part by such mental health entities, which are not his personal fault.

Conclusion

Accordingly, based on all of the foregoing, the defendant respectfully submits that the nature and circumstances of the offense support the conclusion that a sentence of 72 months (6 years), combined with a substantial fine (range is $30,000 to $300,000), is sufficient but not greater than necessary under the circumstances. More particularly, the constellation of the foregoing grounds, to-wit, extremely excessive Guidelines for the unique mix of offenses at issue, the extraordinary acceptance of responsibility demonstrated by defendant, and the heavily mitigated/extenuated mental health factor, combine to justify a substantial downward variance in the interest of a just and fair sentence.

HISTORY AND CHARACTERISTICS OF THE DEFENDANT

Domestic and Environmental History

The defendant, presently 59 years old, was born in Shreveport, Louisiana to Robert Merryman and Edna Allison.   The defendant and his older brother were raised by both parents and all their basic needs were met.  Due to the defendant's father's service in the

19

U.S. Air Force, the family moved around during the defendant's early years.  After only about 9 months in Louisiana, the family moved to Japan until the defendant was approximately 7 years old, and then they lived in New Mexico for several years until 1974, when they moved to Virginia. (PSR at Paragraph 139).

In addition to his father's service with the U.S. Air Force, the defendant's father was also an insurance salesman.  Sadly, he passed away from cancer in 1988.  (PSR at Paragraph 140).

The defendant's mother also worked for the U.S. Air Force but as a civilian employee.  Now 89 years old, she is retired and resides in Norfolk.

The defendant's brother, Steve Merryman, also lives in Norfolk and has his own plumbing company.  (PSR at Paragraph 140).

The defendant indicated that none of his family members have a criminal record.  Although his father reportedly drank alcohol "fairly regularly at times," there is no other history of substance abuse. (PSR at Paragraph 140).

The defendant married twice but does not have any children.  He was briefly married to Terrie Berry from 1994-1996. The defendant reported the marriage did not survive because he was "working too many hours."  (PSR at Paragraph 141).

The defendant married Annie Coenen in 2017. Although the couple have reportedly been separated since 2022, a divorce has not yet been finalized.  According to the defendant, this marriage became strained after the defendant was incarcerated on civil charges and later wore an ankle monitor. (PSR at Paragraph 142).

The defendant advised he has a prescription for medication for high cholesterol but cited no other physical health concerns. (PSR at Paragraph 145).

<u>Mental Health History</u>

20

The defendant did, however, report having a history of mental health issues, starting with a diagnosis for depression in 2004, at which time he was prescribed Wellbutrin. (PSR at Paragraph 146).

Starting in 2015 until the time of his arrest in early 2024, the defendant indicated having a prescription for Lexapro to treat depression "'off and on.'" (PSR at Paragraph 147).

A mental health assessment at The Counseling Center in 2015, ordered while the defendant was on supervised release, resulted in a diagnosis for "unspecified disruptive, impulse control and conduct disorder" and a recommendation for anger management treatment.  (PSR at Paragraph 148).  This earlier diagnosis is surprisingly similar to that of Dr. Elizabeth Wheeler's (*See Motion/Brief For Downward Departure Based On Diminished Capacity*).  As previously filed, Dr. Wheeler opines that the defendant suffers from a personality disorder, to-wit, severe narcissism, which Dr. Wheeler believes affected both the defendant's ability to control his behavior even though he knows it is wrong, as well as the defendant's power to reason through, and against, inappropriate behavior. The severe narcissism diagnosis essentially is a more refined version of the earlier "impulse control and conduct disorder" diagnoses.

Following successful completion of treatment, the defendant was ordered to undergo another mental health assessment at Peninsula Therapy Center near the end of 2015, and he received a diagnosis for "impulse control disorder, not otherwise specified."  (PSR at Paragraph 148).  Again, this earlier diagnosis is remarkably similar to the present primary diagnosis by Dr. Wheeler of sever narcissism.

The defendant further completed anger management courses in 2017 and 2023 in compliance with Court Orders. (PSR at Paragraph 149).

<u>Possible Genesis of Present Race-Related Attitudes, Behavior, and Declarations</u>

The defendant disclosed that he has discussed his behavior towards African American citizens with a counselor at the Western Tidewater Regional Jail. He noted several childhood experiences that he believes may have led him to his behavior issues. The defendant reports that these incidents include: (1) having his Halloween candy allegedly stolen by a 15-year-old African American teenager when he was around 12 years old (defendant's father apparently confronted the teen and recovered the candy); (2)  being taunted by another African American teenager when the defendant was in the seventh grade, resulting in a confrontation of the teen by the defendant's brother, which confrontation led to a physical altercation between them; (3) experiencing consistently late payments by citizens in predominantly African American neighborhoods over the course of approximately 8 years when he worked as a paper boy and attempted to collect money for his services; and, (4) being bullied by an African American teen in 1973. (The defendant advises that he had a chance meeting with this individual in 2023, during which the individual apologized; and he and the defendant are now friends). (PSR at Paragraph 150).

The defendant does not have any substance abuse history. (PSR at Paragraphs 151-152).

<u>Employment History</u>

To his credit, the defendant began working when he was 10 years old, delivering papers and cutting grass, which work he maintained until he was 18.  His mother noted that the defendant "always worked hard" and "was never a disciplinary problem." (PSR at Paragraph 139).

He graduated from Hampton High School in 1984, obtained an associate degree from Ferrum College in 1986, and received a Bachelor of Science degree from Christopher Newport University in 1988.  (PSR at Paragraphs 153-155).

22

As the defendant is currently incarcerated, his sole income is from his rental properties.  Prior to his incarceration, the defendant owned Merryman Grounds Maintenance in Hampton, which business he started in 1991. (PSR at Paragraph 156-157).

The defendant worked full time as a Planner 1 for HRT in Hampton for a year, from 1990-1991, and earned $22,000/year. (PSR at Paragraph 159).

He was a part-time employee with United Parcel Services in Newport News from 1988 until 1991, working as a seasonal loader at $13.00/hour. (PSR at Paragraph 160).

The defendant served in the United States Army Reserve, with a specialty in transportation, from 1988 to 1996, earning the rank of 2nd Lieutenant prior to being Honorably Discharged. He was also awarded the Army Service Ribbon as well as additional ribbons, and was deployed to Operation Desert Storm.  (PSR at Paragraph 161).

From 1975 until 1984, the defendant was employed part-time with a paper route and cutting grass while attending school full time. (PSR at Paragraph 162).

Moreover, through decades of hard work and diligent management, the defendant amassed approximately 65 rental properties, evidencing an extremely devoted work ethic and commitment to hard work.

<u>Discussion of Possible Etiology of Race-Based Behavior and Conduct</u>

While certainly not by any means offered as an excuse or a defense, nevertheless the defendant perceives that his aforementioned early negative experiences may, instead, offer at least some insight into the defendant's unacceptable behavior in the presence of African American citizenss, especially since he perceived these experiences to have happened during his formative years, when he would have been most vulnerable to external influences.

However irrational the defendant's current behavior may be, the defendant attributes

it to environmental factors that shaped and molded him before he was mature and sophisticated enough to comprehend that anecdotal experiences are just that, and not behavioral blueprints that apply generally to specific populations.  The defendant perhaps was too young and traumatized by his experiences to distinguish the specific negative behaviors towards him from the color, race or demographic of the individuals carrying out such behaviors. In other words, the negative experiences were seemingly powerful enough that he was unable to perceive just the specific behavior as negative and, instead, associated the behavior with the race/ethnicity of the person exhibiting it, seeing them both as being negative as a whole.  Instead of feeling slighted by specific individuals, the defendant irrationally felt slighted by an entire demographic.

In general, behaviors and thought processes learned during the delicate childhood years tend to be deeply rooted and ingrained as part of an individual's personality.  These built-in feelings are difficult, at best, to overcome for any person, but certainly for someone like the defendant who has diagnosed "impulse control" and 'severe narcissistic" issues that make him almost unable to help himself, even while he consciously knows that he is not behaving appropriately.

<u>Diminished Capacity</u>

In addition, the defendant suffers from a significantly diminished mental capacity.  A recent evaluation by Elizabeth Wheeler, Ph.D., revealed that the defendant has a personality disorder, to-wit, severe narcissism. She is expected to testify at the sentencing that the defendant's mental health likely "contributed substantially to the commission of the offense," by making it more difficult for the defendant "to exercise the power of reason" to restrain his inappropriate words and acts, as well as to "control behavior that the defendant knows is wrongful" but in which he nevertheless engaged.

24

As sought in the defendant's associated Motion For Downward Departure Under U.S.S.G. § 5K2. 13. Based Upon Diminished Capacity, the defendant respectfully submits that the combination of his ingrained view of African American people which he believes he acquired during his formative years, coupled with his personality disorder, resulted in an inability to control behavior and to exercise the requisite reason to curb it. See U.S.S.G. § 5K2.13. (Diminished Capacity).

Whether cast in terms of a "downdward departure:" or in terms of "a downward variance," either way, the defendant respectful submits that the race-based behavior so predominantly reported in this case is heavily mitigated and extenuated by the defendant's diminished capacity.

Again, while not an excuse for the defendant's behavior, the above is offered solely in an effort to help explain why such misguided behavior exists.

The fact that the defendant seems unable to separate a behavior from the characteristics of the person exhibiting the behavior is supported, conversely, by the defendant's becoming friends with an African American individual after the individual apologized, many years later, for bullying the defendant in 1973. The positive experience of receiving an apology allowed the defendant to see the individual in a positive way regardless of his race. This is a positive indication that the defendant is capable of applying, assigning or limiting specific feelings to specific individuals based on the specific circumstances of the experience, and not associating his feelings with, or extending them to, specific characteristics of those individuals (such as race) and then unreasonably extending such feelings to an entire population.

The defendant's experiences and documented mental health issues certainly provide significant extenuating and mitigating circumstances that warrant a downward

departure/downward variance.

The defendant's employment history, starting in his childhood, proves that he is hard-working and responsible, and that he can be a productive and law-abiding member of the community.

## CONCLUSION

Accordingly, based on all of the foregoing, including, but not limited to, the three (3) substantial grounds discussed above for a significant downward departure/downward variance, the defendant respectfully submits that a sentence of 72 months (6 years), combined with a substantial fine (range is $30,000 to $300,000), is sufficient but not greater than necessary.


DAVID LEE MERRYMAN
By:_____/s/_____
Andrew M. Sacks, Esquire

Andrew M. Sacks, Esquire, VSB#: 20082
Attorney for defendant David L. Merryman Jr.
SACKS & SACKS, P.C.
Town Point Center
150 Boush Street, Suite 505
Norfolk, VA 23510
Telephone: (757) 623-2753
Facsimile: (757) 274-0148
E-mail: andrewsacks@lawfirmofsacksandsacks.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 11th day of December, 2024, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to:

| | |
|---|---|
| Brian James Samuels, Esquire | David M. Coleman, Esquire |
| Assistant United States Attorney | Assistant United States Attorney |
| United States Attorney's Office | United States Attorney's Office |
| One City Center | One City Center |
| 11815 Fountain Way, Suite 200 | 11815 Fountain Way, Suite 200 |

Newport News, Virginia 23606
Telephone: 757-591-4032
Facsimile: 757-591-0866
E-mail: brian.samuels@usdoj.gov

Newport News, Virginia 23606
Telephone: 757-591-4028
Facsimile: 757-591-0866
E-mail: mack.coleman@usdoj.gov

and

Julie Podlesni, Esquire
Assistant United States Attorney
United States Attorney's Office
One City Center
11815 Fountain Way, Suite 200
Newport News, VA 23606
Telephone: 757-591-4000
Facsimile: 757-591-0866
E-mail: julie.podlesni@usdoj.gov

_____/s/_____
Andrew M. Sacks, Esquire

I hereby further certify that on this 11th day of December, 2024, a copy of the foregoing was e-mailed to Senior U.S. Probation Officer Jeff Noll.

_____/s/_____
Andrew M. Sacks, Esquire

Andrew M. Sacks, Esquire, VSB#: 20082
Attorney for defendant David L. Merryman
SACKS & SACKS, P.C.
Town Point Center
150 Boush Street, Suite 505
Norfolk, VA 23510
Telephone: (757) 623-2753
Facsimile: (757) 274-0148
E-mail: andrewsacks@lawfirmofsacksandsacks.com

F:\JC\MERRYMAN David\PositionSentFactors.12 9 2024.docx